24-4486

# United States Court of Appeals
## *for the*
## Fourth Circuit

---

UNITED STATES OF AMERICA,

*Plaintiff/Appellee,*

— v. —

JONATHAN CRAIG OTUEL,

*Defendant/Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT CHARLOTTE

# BRIEF OF APPELLANT

William R. Terpening
TERPENING LAW, PLLC
221 West 11th Street
Charlotte, North Carolina  28202
(980) 265-1700

*Counsel for Appellant*

 (800) 4-APPEAL • (JOB 811916)

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iv

JURISDICTIONAL STATEMENT ....................................................... 1

ISSUES ............................................................................................... 1

STATEMENT OF THE CASE ............................................................... 2

    I.    The Government's Case. ............................................... 2

    II.   The Government Intentionally Destroys Evidence. ............... 4

    III.  Litigating the Motion to Dismiss or Suppress ...................... 6

    IV.  Trial ......................................................................... 12

    V.   Sentencing ................................................................. 17

SUMMARY OF ARGUMENT ............................................................. 19

ARGUMENT ..................................................................................... 24

    I.    The Court Should Have Dismissed the Indictment, or
        Suppressed All Evidence of Methamphetamine, After
        the Government Destroyed the Evidence Upon Which
        the Charges Were Founded .................................................. 24

        a.    Standard of Review ..................................................... 24

        b.    Argument .................................................................. 25

            1.    The district court should have dismissed
                the Indictment .................................................... 26

            2.    Even if dismissal was not required, the
                court should have suppressed evidence of,
                and reference to, the methamphetamine ........... 26

                a.    Law governing suppression ....................... 26

                b.    The evidence was exculpatory ................... 29

       c.    Comparable evidence cannot be obtained by other reasonably ..................... 33

       d.    Due process has been denied because the government acted in bad faith ............ 33

II.    The District Court Should Have Dismissed Count 3 Because the Government Did Not Prove that Otuel Used the Gun "in Furtherance of" a Drug Trafficking Crime ............................................................................ 35

       a.    Standard of Review ...................................... 35

       b.    Argument ..................................................... 36

III.   The District Court Abused its Discretion in Determining the Quantity of Drugs Attributable to Otuel, which the Government did not Prove Beyond a Preponderance of the Evidence. ........................................... 44

       a.    Standard of Review ...................................... 44

       b.    Argument ..................................................... 45

IV.   There was Not Sufficient Evidence to Convict Otuel of Any of the Counts on which the Jury Convicted Him .......... 51

       a.    Standard of Review ...................................... 51

       b.    Argument ..................................................... 52

           1.    Count 1 Conspiracy to Distribute and Possess with Intent to distribute methamphetamine – Under Rule 29 ................. 54

           2.    Possession with Intent to Distribute Methamphetamine – under Rule 29 ................... 57

           3.    The trial court should have dismissed Count 3 – Possession of a Firearm in Furtherance of a Drug Trafficking Crime – under Rule 29 .................................................. 60

4. The district court should have granted
Otuel an new trial under Rule 33 ...................... 61

   a. The government relied entirely on
   non-credible witnesses ............................. 61

   b. The government destroyed
   potentially exculpatory evidence .............. 63

CONCLUSION ...................................................................... 64

REQUEST FOR ORAL ARGUMENT ...................................... 64

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Arizona v. Youngblood,*
  488 U.S. 51 (1988) ........................................................................ *passim*

*California v. Trombetta,*
  467 U.S. 479 (1984) ............................................................. 27, 28, 32

*Gall v. United States,*
  552 U.S. 38 (2007) ......................................................................... 45

*Holdren v. Legursky,*
  16 F.3d 57 (4th Cir.1994) ............................................................ 32

*United States v. Alerre,*
  430 F.3d 681 (4th Cir.2005) .................................................... 35, 51

*United States v. Arrington,*
  757 F.2d 1484 (4th Cir. 1985) ................................................. 53, 54

*United States v. Belcher,*
  762 F. Supp. 666 (W.D. Va. 1991) ............................................ *passim*

*United States v. Bell,*
  667 F.3d 431 (4th Cir. 2011) ....................................................... 46

*United States v. Brown,*
  129 F.3d 1260 (4th Cir. 1997) ..................................................... 27

*United States v. Chan-Astorga,*
  126 Fed. Appx. 364 (4th Cir. 2005) ............................................ 26

*United States v. Claybrooks,*
  90 F.4th 248 (4th Cir. 2024) .................................................. 44, 45

*United States v. Cooper,*
  No. 1:06CR00064, 2007 WL 777981 (W.D. Va. Mar. 11, 2007) ......... 34

*United States v. Crawford,*
  734 F.3d 339 (4th Cir. 2013) ....................................................... 44

*United States v. Debrew*,
No. CR 09-2054 MCA, 2011 WL 13190112
(D.N.M. Apr. 26, 2011)........................................................................ 63

*United States v. Dickerson*,
655 F.2d 559 (4th Cir.1981)............................................................... 26

*United States v. Elliott*,
83 F. Supp. 2d 637 (E.D. Va. Jun. 15, 1999)............................... *passim*

*United States v. Elsheikh*,
103 F.4th 1006 (4th Cir. 2024) .................................................. 24, 25

*United States v. Ferguson*,
752 F.3d 613 (4th Cir. 2014)............................................................. 25

*United States v. Gilliam*,
987 F.2d 1009 (4th Cir. 1993)........................................................... 46

*United States v. Howard*,
773 F.3d 519 (4th Cir. 2014)....................................................... 54, 57

*United States v. Huskey*,
90 F.4th 651 (4th Cir. 2024) ............................................................ 51

*United States v. Iiland*,
254 F.3d 1264 (10th Cir. 2001).................................................... 43, 44

*United States v. Johnson*,
617 F.3d 286 (4th Cir. 2010)............................................................. 24

*United States v. Jones*,
No. 94–5403, 1996 WL 226616 (4th Cir. May 6, 1996) ..................... 55

*United States v. Khweis*,
971 F.3d 453 (4th Cir. 2020)............................................................. 24

*United States v. Leonard*,
777 F. Supp. 2d 1025 (W.D. Va. 2011) ........................................ 55, 57

*United States v. Lomax*,
293 F.3d 701 (4th Cir. 2002)............................................................. 37

*United States v. Mackey*,
265 F.3d 457 (6th Cir. 2001)................................................. 37, 44, 61

*United States v. Matlock,*
    415 U.S. 164 (1974) ............................................................ 26

*United States v. Millender,*
    970 F.3d 523 (4th Cir. 2020) ............................................ 51

*United States v. Nicholson,*
    676 F.3d 376 (4th Cir. 2012) ....................................... 35, 52

*United States v. Onick,*
    889 F.2d 1425 (5th Cir. 1989) .......................................... 59

*United States v. Perry,*
    335 F.3d 316 (4th Cir. 2003) ............................................ 51

*United States v. Perry,*
    757 F.3d 166 (4th Cir. 2014) ............................................ 24

*United States v. Pigrum,*
    922 F.2d 249 (5th Cir. 1991) ................................... 57, 58, 59

*United States v. Reid,*
    523 F.3d 310 (4th Cir. 2008) ............................................ 54

*United States v. Robertson,*
    100 F.3d 1113 (5th Cir. 1997) .......................................... 55

*United States v. Smith,*
    451 F.3d 209 (4th Cir. 2006) ....................................... 35, 51

*United States v. Smith,*
    No. 1:09CR100-2, 2011 WL 809766 (W.D.N.C. Mar. 2, 2011) ..... 36, 53

*United States v. Sullivan,*
    455 F.3d 248 (4th Cir. 2006) ....................................... 36, 53

*United States v. Watkins,*
    519 F.2d 294 (D.C. Cir. 1975) .......................................... 59

*United States v. Woolfolk,*
    399 F.3d 590 (4th Cir.2005) ............................................ 24

*United States v. Young,*
    609 F.3d 348 (4th Cir. 2010) ....................................... 36, 53

*Wall v. Rasnick*,
42 F.4th 214 (4th Cir. 2022) ....................................................... 35, 52

## Statutes & Other Authorities:

18 U.S.C. § 922(g) ........................................................................ 2

18 U.S.C. § 924(c) ................................................................. *passim*

18 U.S.C. § 924(c)(1)(a) ............................................................... 1

18 U.S.C. § 3231 .......................................................................... 1

18 U.S.C. § 3553(a) .................................................................... 18

21 U.S.C. § 841 ...................................................................... 2, 52

21 U.S.C. § 841(a)(1) ................................................................. 54

21 U.S.C. § 846 .................................................................... 52, 54

28 U.S.C. § 1291 .......................................................................... 1

Fed. R. Crim. P. 16(a) ............................................................... 31

Fed. R. Crim. P. 29 ............................................................. *passim*

Fed. R. Crim. P. 29(a) ............................................................... 36

Fed. R. Crim. P. 29(c)(1) ........................................................... 36

Fed. R. Crim. P. 33 ......................................................... 35, 51, 53

Fed. R. Crim. P. 33(a) ............................................................... 53

U.S.S.G. § 2D1.1(c)(4) ............................................................... 48

U.S.S.G. § 2D1.1(c)(5) ............................................................... 48

Webster's II New College Dictionary (1999) ........................... 37

## JURISDICTIONAL STATEMENT

The district court had jurisdiction because this case was prosecuted as an offense against the laws of the United States, over which federal courts have jurisdiction. 18 U.S.C. § 3231. (JA12-14). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. Judgement was entered on September 3, 3024 (JA741-747) and Otuel filed a timely Notice of Appeal the same day. (JA748-749). This appeal is from a final judgment.

## ISSUES

I.    Whether the district court erred when it denied Otuel's motion to dismiss or suppress evidence of methamphetamine, after the government improperly destroyed the suspected narcotics upon which it based its entire case.

II.    Whether the district court should have dismissed Count 3 (alleging a violation of 18 U.S.C. § 924(c)(1)(a)) because the government did not present sufficient evidence that Otuel's firearm was used "in furtherance of" the possession with intent to distribute charge alleged in Count 2.

1

III.    Whether the district court erred in determining the quantity of drugs attributable to Otuel and whether the government proved drug quantity reasonably foreseeable to Otuel by a preponderance of the evidence.

IV.    Whether there was sufficient evidence for the jury to convict Otuel.

## STATEMENT OF THE CASE

### I.    The Government's Case.

Jonathan Otuel was indicted on August 17, 2021. (JA12-14). He was charged with four counts: (1) drug trafficking conspiracy, pursuant to 21 U.S.C. § 841; (2) possession with intent to distribute methamphetamine, pursuant to 21 U.S.C. § 841; (3) possession of a firearm in furtherance of a drug trafficking crime, pursuant to 18 U.S.C. § 924(c); and (4) possession of a firearm by a prohibited person, pursuant to 18 U.S.C. § 922(g). (JA12-14). He was deemed indigent, appointed a lawyer pursuant to the Criminal Justice Act, arraigned, and entered a plea of not guilty on January 28, 2022. (JA3).

The government alleged that Otuel was found outside a third-floor motel room in Pineville, North Carolina, during the evening of November

19, 2019. (JA766). With him outside the motel room was an individual named Vitali Gutorka, who never testified at trial. (JA360-670, JA766). Inside were two men: Christiopher Gibson and Johnny Boone. (JA766). Gibson never testified at trial. (JA360-670). Officers claim they saw a small bag of methamphetamine in plain view when they peered into the room. (JA766).

Officers detained Boone, Gibson, Gutorka, and Otuel and searched the room without a warrant.[1] (JA766). During the search, officers seized: (1) a baggie containing 15 grams of suspected methamphetamine, (2) 1 gram of an unknown white powder in a green backpack containing Gutorka's identification; (3) and a large Ziplock bag inside a black zippered bag containing 318.17 grams of suspected methamphetamine. (JA766). Officers also found a black backpack on a bed next to a motorcycle helmet, gloves, and jacket. (JA766). That black backpack contained a digital scale, a box of baggies, $5,200 in cash, a laptop, and a black pouch allegedly containing 207.74 grams of suspected

---

[1] Officers claimed they went to the room because of a 911 call about a woman being forcibly dragged into the room. (JA375-376). They never found the woman or any evidence supporting the claims in the 911 call. (JA377).

methamphetamine. (JA766-767). The total amount of seized alleged methamphetamine was 541 grams. (JA766-767).

While officers searched the room, Otuel threw his handgun off the motel balcony. (JA766). He admitted this to authorities immediately, at the time of the search. (JA766). This was the basis for the felon in possession count, to which he pled guilty on March 13, 2023 before he went to trial on the remaining counts. (JA205-213).

## II.    The Government Intentionally Destroys Evidence.

After the indictment, but before trial, the government – at its lead agent's direction – destroyed the alleged methamphetamine seized at the motel on November 19. (JA494-495). All charges, except for the firearm in possession charge to which Otuel pled guilty, required proof that the seized substances were methamphetamine and otherwise centered around the destroyed evidence. The indictment alleged Otuel was in a conspiracy involving this evidence, possessed the now-destroyed narcotics on November 19 with intent to distribute them, and used a firearm on November 19 in furtherance of trafficking the narcotics. (JA12-14).

After a series of email exchanges between Customs and Border Protection, Agent Ubaldo Rios, and AUSA Regina Pack regarding whether methamphetamine could be destroyed, Pack wrote, on August 18, 2022: "It is fine to destroy the evidence." (JA27-29). The prosecutor's confirmation appears to have been prompted by an email from Rios, in which he responded to her inquiry about whether "there are other defendants involved," that the evidence was "tied only to Johnny Boone." (JA30-32). Later, on August 23, Rios directly wrote more broadly: "Please destroy all evidence." (JA33-34). According to the Destruction Order, a total of 766.6 grams of drugs and packaging were destroyed. (JA35). The destroyed evidence included all the alleged methamphetamine (between around 525 and 541 grams) seized at the motel on November 19. (JA95). The government claims the wrong evidence was destroyed because Rios "got the [case] numbers confused." (JA95).

The destroyed materials included not just the alleged methamphetamine seized on November 19, but its packaging. (JA95). Prosecutors confirmed: "Absolutely, packaging was destroyed." (JA95).

Rios has a troubling pattern of leading investigations where the government destroys critical evidence. (JA38-44, JA108-114, JA253-264).

Rios was lead agent in the methamphetamine trafficking conspiracy trial of Cristian Cabrera-Rivas in 2021. (JA38-44, JA108-114, JA123-124). In that case, Cabrera-Rivas gave a voluntary interview to authorities immediately after his arrest during Rios' investigation. (JA41-44, JA108-114). The interview was recorded. (JA42, JA108-114). Cabrera's defense, in part, was that during the recorded interview he explained his belief that he was working for authorities during his drug deal, and made other exculpatory statements. As here, material evidence was destroyed before trial – in Cabrera's case, the video and audio recording of the interview. (JA41-44, JA108-114).

## III.   Litigating the Motion to Dismiss or Suppress.

On February 17, 2023, Otuel filed a motion to dismiss or suppress based on the government's destruction of the alleged methamphetamine and wrapping. (JA15-44). The district court held hearings on March 13 and June 23, 2023. (JA67-204, JA276-357).

The court agreed that it prejudiced Otuel not to have the alleged drugs available for testing and weighing, and not to have their wrapping to test for fingerprints. It remarked that "usually there's not exculpatory evidence on the packaging, but there could be. You know, somebody's

6

fingerprint could have shown up and it can't be identified and it's not the defendant's." (JA200).

The suppression hearing began on March 13, 2023 with the trial court's acknowledgment that the alleged drugs were not available to Otuel for testing or weighing, because they had been destroyed. (JA69). He further acknowledged that Otuel was "entitled to do what [he was] denied doing." (JA70). Otuel pointed out the even more significant problem: that "between 525 and 560 grams were seized at the motel," but "766.4 grams of something were destroyed," probably the packaging. (JA70). "And if that packaging was original packaging that the drugs were seized in, that would definitely be exculpatory in the sense that Otuel's fingerprints wouldn't be on it," which would go to liability, not just sentencing weight or weight of the evidence. (JA70). The court later noted that "the evidence is missing and there's a big difference in the weight of the drug and whatever was burned… but there's probably not going to be an explanation for that." (JA195).

Whether Otuel's fingerprints were on the destroyed packaging – a fact question that will never be resolved because of the government's misconduct – went to the core of Otuel's defense that he was never around

the alleged drugs seized at the motel. (JA70). Thus, the missing evidence went to a highly material issue in the case. (JA70). The court confirmed that Otuel had a meritorious issue with respect to the government's destruction of the packaging so that it could not be fingerprinted to show that Otuel did not handle the alleged narcotics. (JA88, JA93-94). The court stated: "[Otuel] has a real issue," because "[e]vidence has been destroyed," and "if packaging was involved, he's got a real good argument on fingerprints." (JA94-95). The government confirmed that it was, indeed, packaging that was destroyed. (JA95-96). And that packaging included the actual Ziploc bags containing the alleged drugs seized at the motel. (JA95 ("It includes the Ziploc bag with the 325.1 grams of methamphetamine, black zip baggy with 219.1 grams of methamphetamine.")).

After this preliminary discussion, testimony was taken from Rios. He acknowledged that, in *Cabrera*, in which he was lead agent just two years earlier, an exculpatory video recording of the defendant's custodial interview was destroyed. (JA109-111). Therefore, a video that could have straightened out disparities between the parties' recollections of events

was unavailable for trial, just like the alleged drugs and wrapping were not available in Otuel's trial. (JA111).

With respect to Rios' unlawful misconduct in Otuel's case, he acknowledged that he instructed prosecutors to destroy the evidence. (JA116). Troublingly, Rios confirmed that the government had conducted no internal investigation into this serious blow to Otuel's constitutional rights, suggesting that the destruction was not of concern to the government – and, thus, perhaps not an error. (JA117-118). Further demonstrating his bad faith and utter disregard for Otuel's rights and the law, Rios did not even email a supervisor about his misconduct. (JA118).

The trial court decided that "there's not a need to dismiss the case" based on the destruction of evidence. (JA137-138). It did not offer reasoning for this, other than stating that the court's "opinion is, it's an unfortunate accident." (JA125-138, JA200).

Instead of dismissing the case, the court decided it should conduct a hearing in which evidence was heard from witnesses to the "destruction of the materials, through the chain of custody. (JA138-142 ("[W]e're probably going to have to set up a hearing involving all of the people that

9

handled the drugs, to get the chain of custody all the way to the destruction, and do the best we can to figure out what was destroyed.")). It observed: "I don't know… what's happened" and that "we are never going to satisfy anybody with regard to that." (JA138). The court and government later agreed that the parties may never know what made up the weight of what was destroyed. (JA191). Court: "I don't know if anything's going to tell us where 766 grams came from. I think it's going to be speculation that its these envelopes." (JA191). Prosecutor: "Your Honor, with confidence, I can tell you that with every single witness I will call it will probably, you know, get us nowhere closer to answering that question." (JA191).

That testimony established a number of important facts about what was ultimately destroyed. (JA146-204, JA276-357). It confirmed that the Ziploc bags that were used by whoever possessed the drugs (and any fingerprints on them) were included in what the government destroyed, and that the packaging was carefully preserved by the Pineville Police Department in manilla envelopes. (JA154-156). All the narcotics seized at the scene were transferred, still in their original packaging, for storage by the Gaston County Police Department, who further protected the

10

evidence by wrapping the envelopes in plastic. (JA158-160). Several witnesses testified about the measures all custodians took to preserve and protect the packaging before Rios and Pack ordered it destroyed. (JA172). The March 13 hearing was adjourned because the government could not secure all chain of custody witnesses that day. (JA193-197).

During the period between the two hearings, the government indicated that Rios would leave the country during the time when the trial was scheduled. (JA243). Otuel had to file a motion and pursue time-consuming administrative procedures to secure his testimony. (JA219-275, JA279-281).

The hearing resumed on June 23, 2023. (JA276). Government chemist Natalie Ray testified that she tested the material that would later be destroyed. (JA285-286). She confirmed that part of the weight of the evidence came from the packaging. (JA286-287). Ray determined the narcotics weighed 525 grams. (JA299-300). After she tests drugs, she retains the packaging, keeping it with the drugs. (JA310-311). In the seven years she worked testing drugs with the government, she *never* heard of a case where the government destroyed suspected drugs before trial. (JA312).

Once it heard evidence, the court denied the motion to suppress without supplying any reasoning or analysis. (JA343-351). It issued a three paragraph written order on July 14, 2023 – denying the motion "for the reasons stated in open court," which were never stated in open court. (JA358-359). The terse order suggested the court thought Otuel had to show bad faith: "Defendant's due process rights were not violated because Defendant has not shown bad faith by the Government related to the inadvertent destruction of the evidence at issue in this case." (JA358).

## IV. Trial.

Trial occurred on August 1 and 2, 2023. (JA360-670). A Pineville Police Officer present at the motel on November 19, 2019, testified that Otuel was not inside the motel room where the alleged drugs were seized. (JA375, JA381, JA399). She testified that she had never seen Otuel selling drugs, never seen a video or photograph of him selling drugs, never heard a phone call in which he set up a drug deal, and never witnessed him selling drugs to an undercover officer. (JA399-400).

Inside the room, she found around 515 grams of alleged narcotics, which she collected, packaged, and sealed. (JA384-396). She found the evidence already in packaging presumably supplied by whoever

12

possessed the alleged narcotics, which was never fingerprinted. (JA404-405, JA407). Although Otuel was not in the room, another individual named Johnny Boone was found sitting next to the alleged drugs. (JA406-407). No identifying information for Otuel, such as a driver's license, was found in the room. (JA408-411). The officer did not believe that Otuel even had a key to the room. (JA411).

Boone – the individual found in the room with the alleged drugs – testified pursuant to a plea agreement. (JA432). Boone sports an Aryan Brotherhood tattoo, and admitted to being a career drug dealer. (JA432-433, JA479). He boasted that he was so successful as a drug dealer that he "started moving up," selling to other drug dealers. (JA434-435). Boone finished serving a prison sentence in October 2019 – shortly before the events of November 19. (JA437). Boone retained his clientele while incarcerated, and was back to dealing with Chris Sigmon and others the day he left prison. (JA437-440, JA528). He immediately bought a large quantity of methamphetamine from Sigmon. (JA438-439). He was so connected that he was able to sell it within a day. (JA439).

Boone testified that he was referred to Otuel because Sigmon could not supply enough methamphetamine for Boone's sales demands.

13

(JA440-441). He claimed they first met the week he was released from prison, around October 31, 2019, and that Otuel sold him a little less than a pound. (JA441, JA467-469). At the time, Otuel was homeless – living in a storage trailer with a door that would not shut, in a used car lot. (JA445, JA464). Boone only met Otuel once more between the October 31 meeting and November 19. (JA471). Nobody who supposedly witnessed these meetings between Boone and Otuel testified at trial. (JA472-473). Even Sigmon never saw Otuel sell drugs to Boone. (JA474).

Otuel, Boone, and Sigmon were all methamphetamine addicts. (JA445, JA455-456, JA524-527). Sigmon was using methamphetamine "heavily" during November 2019, and had tried a dozen drugs in total, including heroin. (JA543). He suffered from seizures. (JA543). Otuel, a homeless drug addict, used methamphetamine with them. (JA537). Boone acknowledged that, since Boone lived in a storage unit, a significant benefit of having access to a motel was a shower and a bed. (JA465-466).

Sigmon, like Boone, was a successful drug dealer who supplied drugs to Boone and at least six or seven others. (JA529-530). He testified that he met Otuel through Boone – so he knew him for even less time

than the two or three weeks Boone had known him before the November 19 incident. (JA522, JA545). Even Sigmon did not meet Boone until he was released from prison in October 2019. (JA527). Like Boone, Sigmon had pled guilty to drug crimes, was awaiting sentencing, and was hoping for a more lenient sentence in exchange for his cooperation against Otuel. (JA523). He was interviewed at length by Rios during November 2021, and never mentioned Otuel. (JA549-550).

Sigmon – along with Boone, only one of two witnesses who testified that Otuel sold any drugs – could only remember two transactions involving Otuel. (JA530-536). With respect to the first transaction when he met Otuel, he did not testify that he purchased drugs from Otuel. (JA531-532). All he could say was that Otuel introduced him to an unnamed "Asian or Hispanic" person at a rented house whose address he could not remember. (JA531-532). Otuel's only benefit for allegedly making the introduction was that Sigmon gave him a personal use quantity of methamphetamine. (JA534). The only witness to this purported transaction was Boone, the only other witness claiming direct knowledge of Otuel's alleged drug crimes. (JA541).

The second time they met, Sigmon claimed, Otuel sold him a quarter pound of methamphetamine. (JA536). This time, there were no other witnesses at all. (JA541). Those are the only two times that Sigmon claimed he could be sure he dealt with Otuel, testifying about those two purported transactions and admitting that "[i]t was a total of two or three times." (JA536). Sigmon had no direct knowledge about the incident on November 19. (JA542-543).

Rios' trial testimony was consistent with his testimony at the suppression hearing. (JA485-503). He admitted he directed Customs and Border Protection to destroy the evidence. (JA95, JA497). In his experience in law enforcement, dating back to 2007, he was unaware of any instance where drugs and packaging were destroyed while the parties were waiting for trial. (JA500).

As with all others investigating Otuel, he never saw Otuel sell drugs, not in videos or photographs, nowhere. (JA498-499). Undercover agents never purchased from Otuel, and there were no recordings of calls where Otuel was trying to set up drug deals. (JA499). In fact, until Otuel was found at the motel on November 19, he was not being investigated –

Rios' investigation focused on Boone. (JA503-504). He never seized any drugs belonging to Otuel. (JA503-504).

At the close of the government's evidence, Otuel made a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, which was denied. (JA553-559). Otuel also moved to dismiss the charge under 18 U.S.C. § 924(c), for use of a firearm in furtherance of a drug crime. Judge Cogburn later noted that "there was nothing [put in evidence]" about the gun… [o]ther than the fact that it got thrown over the rail and… it never got put into evidence." (JA562-565). The court redacted from the indictment the felon in possession charge to which Otuel pled guilty before the trial. (JA656, JA658-661).

The jury convicted Otuel on all remaining counts. (JA664-666, JA671-672).

Otuel filed a timely post-trial motion for judgment of acquittal or for a new trial. (JA682-694). The court denied it. (JA730-740).

## V.   Sentencing.

Otuel was sentenced on August 19, 2024. (JA695-729). Pursuant to the Presentence Investigation Report, Otuel faced a sentencing guidelines range of 151 to 188 months, plus a consecutive five-year

sentence for the 18 U.S.C. § 924(c) firearm in furtherance charge. (JA696, JA778). The PSR determined that Otuel was responsible for 525.91 grams of methamphetamine, which ostensibly was the amount seized in the motel room on November 19. (JA769). Otuel objected that there was insufficient evidence that the drug amount attributable to Otuel exceeded 500 grams, resulting in a base offense level that was too high. (JA698).

The court briefly misstated Otuel's argument that the § 924(c) charge should be dismissed for lack of evidence the gun was used "in furtherance" of Count 2. He stated that: "I understand what Mr. Terpening's argument is, that there was only one bullet in the gun and that he was using it to defend himself as a homeless person, rather than with the drugs." (JA701). But, the court noted, "[t]hings can have a dual purpose, [a]nd as the old 'Smuggler's Blues' talk about… they always carry firearms because they always carry cash." (JA701). This statement did not address Otuel's argument.

After hearing argument under 18 U.S.C. § 3553(a), the trial court varied downward to a level 32, and sentenced Otuel to 5 years on the

firearm in possession count, to run consecutively to 121 months on the remaining counts. (JA723).

The district court entered final judgment on September 3, 2024 and Otuel filed a timely Notice of Appeal the same day. (JA741-748).

## SUMMARY OF ARGUMENT

The lead agent and prosecutor ordered destruction of the evidence that was most important to both sides – the alleged drugs. They also destroyed the most important exculpatory evidence necessary for Otuel's defense: the original packaging in which the alleged drugs were wrapped. The district court should have dismissed the case – or at least suppressed evidence and related argument – because of this misconduct. Its failure to do so violated Otuel's due process rights by robbing him of his strongest defenses. The agent and prosecutor's misconduct prevented Otuel from showing the jury that his fingerprints were not on the drug packaging. The government prevented him from demonstrating that some or all of the substances were not illegal drugs. It prevented him from showing that the drug weight was less than determined in the PSR.

The district court never explained why it denied the motion to dismiss or suppress, which is itself error. It never addressed Otuel's arguments. Otuel satisfied the factors required for suppression.

First, Otuel showed that the evidence was known to be exculpatory before Agent Rios and AUSA Pack destroyed it. The wrapping in which officers found the alleged drugs was exculpatory because it would have shown that Otuel never touched them. The alleged drugs were exculpatory because they may not have been illegal substances and probably weighed less than 500 grams.

Second, obviously, the substance and wrapping cannot be obtained by any other means.

The third and last factor – which the court erroneously required – is the government's bad faith. To be sure, Otuel showed bad faith. Rios has a habit of destroying material evidence. In addition, he and Pack violated protocol when they destroyed the evidence. Bad faith is further shown by the government's inexplicable decision not to conduct an internal investigation to discover the reason Rios and Pack severely violated Otuel's constitutional rights. And – incredibly – the government

tried to make Rios unavailable for the trial by deploying him abroad during the scheduled trial dates.

Although, therefore, Otuel demonstrated bad faith, it was error for the district court to require him to. The authority – particularly *Youngblood*, 488 U.S. at 56 as interpreted by *Belcher*, 762 F. Supp. at 671-73, does not require a showing of bad faith when the evidence destroyed is – as here – evidence that the government *must* use to prove its case.

**

The trial court should have dismissed Count 3, alleging that Otuel used a firearm "in furtherance of" the drug distribution charge alleged in Count 2. The distribution charge was based solely on the alleged drugs and events at the motel on November 19. But there was no evidence that Otuel used his gun "in furtherance of" sale of the drugs at the motel – and plenty of evidence he did not.

The gun and Otuel were not near the drugs. No drugs were sold that day. The drugs were found near Boone (because they belonged to him). Even if Otuel was involved in plans to sell drugs that day (he was

not), Boone and the others in the room controlled the room, rendering it a safe space, to them.

Otuel had no record of criminal violence. He needed a gun for protection because he was homeless, sleeping in a storage shed in a parking lot with a broken door. There were either no bullets or one bullet in the gun – the officer did not even know.

There is simply no evidence that Otuel used the gun to further drug deals on November 19. He was charged under 18 U.S.C. § 924(c) simply for having a gun. To not dismiss Count 3 was error.

***

The court made several errors regarding assessment of drug quantity when it sentenced Otuel based on 525 grams of methamphetamine. There was little to no evidence that Otuel possessed or was responsible for the alleged drugs in the motel room. The court *never* explained its basis for concluding otherwise. The trial court did not address any of Otuel's arguments about possession or drug weight.

****

Finally, there was insufficient evidence to convict Otuel on any charge that went to trial. The government relied solely on Boone and

Sigmon's testimony. Both sought a sentence reduction for testimony, both barely knew Otuel, and they testified about only a couple of transactions that were not witnessed or corroborated by anyone. No law enforcement officer *ever* saw Otuel involved with a drug transaction and, therefore, there were no recordings or photographs of him dealing drugs.

On the other hand, there was compelling evidence that Otuel was an itinerant drug addict who was present at the motel for a shower and a safe bed for the night.

And, egregiously, the government destroyed the best evidence Otuel would have used in his defense – the packaging that did not contain his fingerprints and DNA. The government flagrantly deprived Otuel's due process rights in bad faith and confident in their impunity. It did not even conduct an internal investigation or take remedial measures, and tried to make Rios – the serial destroyer of evidence – unavailable for cross examination at trial.

# ARGUMENT

## I. The Court Should Have Dismissed the Indictment, or Suppressed All Evidence of Methamphetamine, After the Government Destroyed the Evidence Upon Which the Charges Were Founded.

### A. Standard of Review.

"'We review the district court's factual findings on a motion to dismiss an indictment for clear error, but we review its legal conclusions de novo.'" *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014)(quoting *United States v. Woolfolk*, 399 F.3d 590, 594 (4th Cir.2005)).

"When reviewing the denial of a motion to suppress, [the Court] review[s] the factual findings for clear error and the district court's legal determinations de novo." *United States v. Elsheikh*, 103 F.4th 1006, 1013 (4th Cir. 2024)(quoting *United States v. Khweis*, 971 F.3d 453, 459 (4th Cir. 2020)). This Court reviews evidentiary rulings for abuse of discretion. *Elsheikh*, 103 F.4th at 1013 (citing *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010)). "[A] court abuses its discretion when it is either 'guided by erroneous legal principles' or it made its decision based 'upon a clearly erroneous factual finding.'" *Id.* However, the Court will not reverse if the error was harmless. *Id.* Harmlessness is

determined "by applying the standard for either constitutional or non-constitutional error, depending on the nature of the underlying argument to exclude the evidence." *Elsheikh*, 103 F.4th at 1013 (citing *United States v. Ferguson*, 752 F.3d 613, 618 (4th Cir. 2014)). "Constitutional errors must be found harmless beyond a reasonable doubt, whereas reversal of a non-constitutional error requires lesser proof." *Ferguson*, 752 F.3d at 618.

### B.    Argument.

The district court's denial of Otuel's pre-trial motion to dismiss or suppress, based on the government's destruction of the alleged drugs seized at the motel on November 19, made clearly erroneous factual findings and misapplied the law. The government cannot prove beyond a reasonable doubt that the error – which was constitutional in nature – was harmless. The Court should vacate the conviction.

While the case was pending, the government intentionally destroyed the key evidence – the purported methamphetamine that the charges were based upon, and the wrapping it came in. Thus, Otuel could not test or weigh the narcotics and could not demonstrate to the jury that his fingerprints and DNA were not on the wrapping. The district court

should have dismissed the charges, or suppressed all argument and evidence related to the destroyed evidence.

### 1. The district court should have dismissed the Indictment.

The court should have dismissed the case because Otuel demonstrated that he was deprived of due process by the government's destruction of material evidence. *See, e.g., United States v. Chan-Astorga*, 126 Fed. Appx. 364, 365 (4th Cir. 2005). The court's failure to explain why it denied the motion is, itself, error.

### 2. Even if dismissal was not required, the court should have suppressed evidence of, and reference to, the methamphetamine.

#### a. Law governing suppression.

The burden of proof is initially on the party seeking to suppress the evidence. *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir.1981). Once the defendant establishes a basis for suppression, the burden shifts to the government to prove admissibility of the challenged evidence by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n. 14, (1974).

"To establish a due process violation for failure to preserve… evidence a defendant must show: (1) that the evidence possessed

26

exculpatory value which was apparent prior to its destruction; (2) that the defendant cannot obtain comparable evidence by another means; and (3) bad faith in the destruction of the evidence." *United States v. Brown*, 129 F.3d 1260 (4th Cir. 1997)(citing *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988)(adding third requirement); *California v. Trombetta*, 467 U.S. 479, 489 (1984). Bad faith is shown when "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58.

One court within this Circuit has held that where, as here, the government "intentionally destroy[s] evidence that is absolutely crucial and determinative to a prosecution's outcome… the *Youngblood* [bad faith] caveat does not apply." *United States v. Belcher*, 762 F. Supp. 666, 671-73 (W.D. Va. 1991). It distinguished *Youngblood* on the basis that the prosecution in *Youngblood* did not use the lost evidence in it case in chief, and the *Belcher* prosecutors "*must* use testimony regarding the alleged marijuana if it is to convict the Belchers." 762 F. Supp. at 672 (discussing 488 U.S. at 56). The Fourth Circuit never considered this ruling or analysis, but it should consider the issue here. This is particularly important because even the *Youngblood* court made the

27

factual distinction that *Belcher* relied on, noting that "here, unlike in *Trombetta*, the State did not attempt to make use of any of the materials in its own case in chief." 488 U.S. at 56.

The district court improperly (and without explanation) rejected *Belcher*. If the Court accepts *Belcher's* reasoning, it will conclude that the destroyed alleged drugs and packaging had exculpatory value and that Otuel could not obtain comparable evidence by another means. The district court should not have required a showing of bad faith. But, either way, Rios' unfortunate pattern of leading cases where material evidence is destroyed demonstrates bad faith, and the district court should have found that all three considerations were satisfied.

In short: The district court committed legal error both by assuming that bad faith was a necessary part of Otuel's showing on a motion to suppress. (JA358). It committed procedural error by never addressing Belcher or explaining why it rejected its reasoning. And even if this Court concludes that Otuel had to show bad faith, the trial court also committed error by failing to find that all three factors were satisfied. As a result, Otuel was harmed by the fact that the government could use evidence of

28

drugs against him, while he could not show that the drugs were not drugs, were not his, and were not in the alleged quantity.

## b. The evidence was exculpatory.

As the *Belcher* court wrote, the problem with requiring a defendant to show that the government knew that the evidence was exculpatory before it destroyed it is that "government officials can routinely destroy drugs, then argue that the drugs had no exculpatory value because the government officials 'knew' that the drugs were indeed drugs." 762 F. Supp. at 672-73. Here, the government had a chemist testify that the substance tested as methamphetamine. (JA504-519).

Yet Otuel has no way of testing those results. The jury could not see the evidence at trial and assess whether, in its opinion, the evidence was methamphetamine. Otuel could not ascertain the actual weight of the alleged drugs – and the evidence on weight certainly was questionable. The testimony was that seized drugs contained packaging, casting doubt on whether the 525 grams used to for sentencing purposes was actually less than 500 grams.

766 grams were destroyed. (JA120, JA191). Whether what was destroyed was drugs or how much of it was drugs can never be answered

because of the government's misconduct, and this information is certainly exculpatory. The court agreed that "I don't know if anything's going to tell us where 766 grams came from." (JA191). If the difference in weight was untested purported drugs, that fact and the evidence would be *inculpatory*, and the government would have used it at trial. It is, therefore, probable that at least some of what was destroyed was exculpatory.

All witnesses and the court agreed that the packaging that the government said made up for the 241-gram shortfall between the tested evidence and destroyed evidence contained *original* wrapping. If so, fingerprints, (or lack of them) would be exculpatory. The government should have known whether Otuel's fingerprints were on the packaging, and therefore should have known that the destroyed packaging was exculpatory.

Under similar facts, a federal district court within our Circuit found that it was proper to exclude evidence. *United States v. Elliott*, 83 F. Supp. 2d 637, 643 (E.D. Va. Jun. 15, 1999). There, the defendant was charged with conspiracy to distribute methamphetamine. *Id.* at 639-41. The case relied on evidence that the defendant's fingerprints were on

glass vessels used to manufacture methamphetamine. *Id.* at 640-41. The DEA destroyed the glass vessels after they tested for fingerprints, but before the defense could. *Id.* The fingerprints in *Elliott* are like the alleged drugs here: the government's case was based on the evidence, but the defendant could not test it.

Judge Payne's analysis suggests the correct approach, that if the government intends to use evidence to convict a defendant, the defendant is entitled to inspect it:

> [W]here…the Government has seized evidence which it believes is probative of guilt, the rules by which our trials are conducted make that evidence available for examination by the defendant so that he may mount any available attack upon its use against him and so that he may use it in his defense if it tends to exculpate him. To this end, a defendant is entitled, with proper restrictions and conditions, to have evidence tested and examined so that he may make any meaningful use of any exculpatory value which it has and so that he may, if possible, counter its inculpatory effects.

> Thus, where a piece of physical evidence is subject to both lawful and unlawful uses and the defendant's fingerprints are found on it, a defendant would be entitled to have the item tested and to present evidence that the residue of substances on the physical item of evidence is of a substance the possession or use of which is not unlawful. Evidence of that sort clearly would be exculpatory in a case where it is alleged that the particular physical evidence was used to effectuate an illegal purpose.

*Id.* at 641-42 (citing Fed. R. Crim. P. 16(a)).

*Elliott* then assessed what the Supreme Court meant, in *Trombetta* and *Youngblood*, when it instructed that "mere possibility" that evidence "could" exculpate a defendant was not enough to satisfy the exculpatory factor. *Id.* at 642. *Elliot* held that "the exculpatory value of the evidence must be *apparent*, and this must be judged based on the facts, circumstances and knowledge available to law enforcement before the evidence is destroyed." *Id.* at 642 (citing *Holdren v. Legursky*, 16 F.3d 57, 60 (4th Cir.1994) (finding no constitutional error when government physician rendered specimens unsuitable for testing by defense experts, where there was no evidence of bad faith because physician followed standard procedures and at the time that the physician disposed of additional specimens, the exculpatory value was unknown because it had not yet been tested).[2]

As here, "the threshold question is whether the [evidence] which was destroyed here had exculpatory value and whether that exculpatory value was apparent to the reasonable law enforcement agent before the

---

[2] Here, of course, is the opposite of *Holdren*. Rios and Pack violated established procedure, and it is without question that the alleged drugs and (in particular) the packaging were (particularly in the case of the packaging) probably exculpatory.

glassware was destroyed." *Id.* at 643. Just as in *Elliott*, any reasonable law enforcement officer would see that the alleged drugs testing negative and lack of fingerprints would be extremely materially exculpatory. In both cases, "it is beyond serious question that a reasonable law enforcement agent would recognize, before the glassware was destroyed, that it was of potentially exculpatory value. And, without question, the exculpatory value of the destroyed evidence was significant." *Id.*

### c. Comparable evidence cannot be obtained by other reasonably.

This is the easiest factor for Otuel to satisfy. With the evidence gone, he cannot test independently to confirm whether the suspected drugs are illegal methamphetamine, and he cannot show that his fingerprints and DNA are not on the packaging. The jury had to simply take the government's word that the destroyed material was methamphetamine. There was no neutral or unbiased evidence that it was illegal drugs.

### d. Due process has been denied because the government acted in bad faith.

If the Court agrees with the analysis in *Belcher*, the bad faith inquiry is not relevant here because the government had to use evidence

related to the alleged methamphetamine to prove all but one of the charges. *See Belcher*, 762 F. Supp. at 671-73.[3] However, Rios has a pattern of leading cases where critical evidence is destroyed – whether the interview recording in *Cabrera* or the purported methamphetamine and packaging here. In *Cabrera*, as here, the trier of fact was left with the government's untested summary of the destroyed evidence – there, sparse agent notes; here, unreviewable lab testing results. (JA41-44).

As an alternative basis for finding bad faith, Rios – in ordering the evidence to be destroyed – acted out of accordance with established practice or policy. *Elliott*, 83 F. Supp. 2d at 647. Compounding the bad faith, the government admits that it did not conduct an internal investigation or take remedial measures to address significant

---

[3] Another reason it is unnecessary for Otuel to show bad faith that the destroyed evidence is not merely "potentially" exculpatory, but definitely exculpatory. *See United States v. Cooper*, No. 1:06CR00064, 2007 WL 777981 (W.D. Va. Mar. 11, 2007). As is noted in *Youngblood* itself, when unproduced or destroyed evidence is exculpatory, good or bad faith is irrelevant. *See* 488 U.S. at 57. It is only when "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," that bad faith must be shown. *Id.* If the destroyed packaging was original and had no fingerprints, the absence of Otuel's fingerprints would be exculpatory. If it had fingerprints, but not his, it would be exculpatory. If it had other fingerprints, plus his, that could be exculpatory as well.

constitutional errors. (JA89-90, JA99, JA135, JA500). And, there is the fact that the government tried to send Rios abroad and unavailable for trial. (JA219-281).

## II. The District Court Should Have Dismissed Count 3 Because the Government Did Not Prove that Otuel Used the Gun "in Furtherance of" a Drug Trafficking Crime.

### A. Standard of Review.

"We review de novo a district court's denial of a motion, made pursuant to Rule 29 of the Federal Rules of Criminal Procedure, for judgment of acquittal." *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006)(citing *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir.2005)). The Court reviews denial of a motion for a new trial, under Federal Rule of Criminal Procedure 33, for abuse of discretion. *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006). "'A district court abuses its discretion when it acts in an arbitrary manner, when it fails to consider judicially-recognized factors limiting its discretion, or when it relies on erroneous factual or legal premises.'" *Wall v. Rasnick*, 42 F.4th 214, 220 (4th Cir. 2022)(quoting *United States v. Nicholson*, 676 F.3d 376, 383 (4th Cir. 2012) (other citations omitted)).

### B.    Argument.

The government did not present sufficient evidence to the jury that Otuel's firearm was used "in furtherance of" the drug trafficking crime alleged in Count 2 of the Indictment. The district court should have entered a judgment of acquittal on Count 3.

Rule 29 directs a court, upon a defendant's motion after the close of evidence and before submission to the jury, to enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. Fed. R. Crim. P. 29(a). The motion can be renewed after a guilty verdict. Fed. R. Crim. P. 29(c)(1). The verdict will be sustained only if, when the evidence is viewed in the light most favorable to the government, there is substantial evidence to support it. *United States v. Smith*, No. 1:09CR100-2, 2011 WL 809766, at *1 (W.D.N.C. Mar. 2, 2011) (citing *United States v. Sullivan*, 455 F.3d 248, 260 (4th Cir. 2006). Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt. *Id.* (citing *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010)).

This Circuit gives "furtherance" its "plain meaning": "'the act of furthering, advancing, or helping forward.'" *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002) (quoting Webster's II New College Dictionary 454 (1999)). "§ 924(c) requires the government to present evidence indicating that the possession of a firearm furthered, advanced, or helped forward a drug trafficking crime." *Lomax*, 293 F.3d at 705. This Circuit offers advisory factors a jury might consider in determining whether a firearm was used in furtherance of a drug trafficking crime. *Id.* These include, among others, any way the "firearm might further or advance drug trafficking," such as whether it "provided defense against theft of drugs, helped with collection, or helped a dealer defend his turf." *Id.* Factors may also include the type of weapon, "type of drug activity," whether and how the gun is loaded, "proximity to drugs or drug profits," and "time and circumstances under which the gun is found." *Id.* "[P]ossession of a firearm on the same premises as a drug transaction would not, without a showing of a connection between the two, sustain a § 924(c) conviction." *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001).

The court instructed the jury that to convict Otuel on Count 3, it would need to find beyond a reasonable doubt that the evidence showed that he used his firearm in furtherance of the drug trafficking alleged in Count 2. (JA653). It explained to the jury that "[p]ossessing a firearm 'in furtherance of' a crime' means that the firearm helped, promoted, or advanced the crime in some way." (JA653). The firearm had to be used specifically in furtherance of the drug trafficking alleged in Count 2, which specifically pertained to the events at the Pineville motel on the evening of November 19, 2019. (JA652-653). Count 2 is not a conspiracy charge. Thus, for a conviction on Count 3, the government had to prove beyond a reasonable doubt that Otuel used his gun in furtherance of whatever dealing – if any – happened in the room.

The problem is that the only deal that even allegedly occurred in or around the room was Boone's claim that Otuel sold him the 300 grams of methamphetamine Boone was caught with. There was no evidence the deal ever occurred, other than Boone's unsupported testimony. There is no evidence that Boone even knew about Otuel having a gun during that deal (which probably never occurred). Certainly, no gun was necessary in furtherance of this "friendly" deal between two men who allegedly

routinely assisted each other with supply chain issues. The facts at trial did not support the allegation that Otuel used his firearm in furtherance of the trafficking that allegedly occurred at the motel on November 19. Quite the opposite.

A summary of the limited evidence demonstrates how little support there was for Count 3. Focusing on the evidence about November 19, in the light most favorable to the government, Otuel appeared outside a motel room that he intended to share with people he was comfortable enough around to share a motel room with. He was there not just for selling drugs or even principally for selling drugs, but for using drugs, showering, getting shelter and eating.

Regarding type of drug activity, Boone claimed that Otuel sold him drugs. There would not have been need for the defense or threat provided by a gun for that friendly transaction. The government's case was that Boone and Otuel helped each other out by exchanging drugs to fill supply chain shortages.

Boone was the only witness who testified that he was a purchaser. Although the government speculated, during closing argument, that perhaps more purchasers would show up later, none did, and there was

no evidence that any had been there or would come in the future. The evidence was that no others had appeared at the room than the group of purported friends. And if low level users did come to purchase personal use amounts of drugs (and again, there is no evidence of this), any effort to steal the drugs would occur in the context of the three or four alleged dealers in the room versus one purchaser. Hardly a situation where Otuel would have needed a gun. It is not as if he was exposed, selling drugs on a street corner. There was no evidence of street gang activity. No police officer observed any potential drug purchasers arriving at the room or motel during the lengthy period while they were investigating, interviewing witnesses, and executing a search warrant. This is because there were none. Police came to the room in the first place because of false claims that a woman was screaming in the room – claims that were never corroborated and that were evidently not true. They did not come to the room because anyone contacted them to complain that they observed drug dealing.

Otuel has no violence in his record. (JA771-772). His handful of crimes are non-violent, limited to probation for methamphetamine

possession and vehicle moving violations. (JA771-772). He has only one criminal history point. (JA772).

Not a single law enforcement officer had any direct evidence of dealing, period. No video, photographs, or even simple eyewitness testimony from the authorities corroborated the claim that they might later be dealing. Count 2 is not a conspiracy count, so the purported deals with Otuel claimed by Boone and Sigmon at other times cannot be part of the crime that the government claims the firearm furthered. The government did not even offer a theory as to why the gun furthered the purported Boone deal on November 19.

The bottom line on the *only* actual dealing that allegedly occurred on November 19 is that the *only* evidence that *any* drug deal occurred is Boone's unreliable testimony that Otuel sold him the drugs he was caught with in the room. That is the only actual deal that, believing the government's evidence as true, even the government has any proof for at the room on November 19. There would be no place for a gun in that single friendly deal. Consistent with this, Boone never testified that he saw the gun when he allegedly bought the drugs from Otuel on November 19, or that he knew about the gun being on Otuel's person that day.

In fact – and this is a significant deficiency in the 924(c) case – the government presented no evidence that Otuel even had the gun in his possession at the time when Boone says Otuel sold him drugs earlier on November 19 – the only alleged drug deal of the day.

The gun itself militates against the conclusion that it was used in furtherance of drug trafficking on November 19. The officer who dealt with the gun did not even recall whether there was any ammunition in the firearm. (JA426). His bodycam video was shown at trial – it is evident from the video that the gun had at most only a single bullet in it. This would be insufficient to do much to help Otuel if a deal went sour. The gun was not fully loaded or even mostly loaded; possibly it was not loaded at all. It was not a semi-automatic weapon. Importantly, there is no evidence that Otuel brandished it or that anyone present on November 19 could have seen it to know that it was on his person. Nobody knew about it, therefore its only possible role as part of defense or intimidation could not be fulfilled. Otuel and his gun were not near any drugs, which were in the room – most of them (300 grams) a foot from Boone, according to Corporal Kimmel. The gun was on Otuel's person, outside the room, not near any drugs or profits.

Moreover, Boone testified that Otuel usually lived in a storage trailer in a car park, with no restroom or amenities, and a door that could not be closed. Otuel had to do things like come to the Pineville motel to shower and sleep in normal shelter. He had the firearm for protection against an intruder into the trailer. There was no evidence or testimony that Otuel ever actually used the gun while doing a drug deal – and certainly not on November 19.

Ultimately, there was no nexus between the purported drug dealing at the motel and the gun to sustain a conviction on Count 3. Otuel's situation is addressed well by the reasoning in *United States v. Iiland*, 254 F.3d 1264, 1274 (10th Cir. 2001)("The fact that drug dealers in general often carry guns for protection is insufficient to show possession in furtherance of drug activity in Mr. Iiland's particular case."). There, as here,

> [t]he facts [showed] only that a drug dealer possessed a gun. No evidence demonstrates that his possession furthered, promoted or advanced his illegal drug activity. There was no evidence that the gun and drugs were ever kept in the same place or that Mr. Iiland ever kept the gun accessible when conducting drug transactions.

*Id*. There (where the defendant also was a convicted felon), as here, the firearm in possession conviction was appropriate, but the 924(c) charge

43

was not. *Id.* at 1270-74. Otuel had a gun – that is all that the evidence

established. The presence of a gun where a drug transaction occurred –

and at most only one transaction did occur here – is not without more

enough to sustain a § 924(c) conviction. *Mackey*, 265 F.3d at 462 (6th Cir.

2001).

**III.  The District Court Abused its Discretion in Determining the Quantity of Drugs Attributable to Otuel, which the Government did not Prove Beyond a Preponderance of the Evidence.**

**A.     Standard of Review.**

The district court's sentence is reviewed for abuse of discretion.

*United States v. Crawford*, 734 F.3d 339, 341-42 (4th Cir. 2013) (citations

omitted). This "translates to review for reasonableness." *Id.* at 342

(citations omitted). Sentences should be procedurally and substantively

reasonable. *See id.* Sentences are procedurally unreasonable when a

court imposes a sentence imposes a sentence based on clearly erroneous

facts, fails to explain the sentence adequately, or fails to address the

defendant's nonfrivolous arguments. *United States v. Claybrooks*, 90

F.4th 248, 256-57 (4th Cir. 2024). "A district court is required to provide

an individualized assessment based on the facts before the court, and to

explain   adequately   the   sentence   imposed   to   allow   for   meaningful

44

appellate review and promote the perception of fair sentencing." *Claybrooks*, 90 F.4th at 257 (citing *Gall v. United States*, 552 U.S. 38)(2007))(internal quotation marks omitted).

Calculation of drug quantity for sentencing purposes is reviewed for clear error. *See id.* (citations omitted). The Court will only reverse the district court if it is "left with the definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks and citation omitted).

### B.    Argument.

The district court's election to sentence Otuel based on a methamphetamine quantity of over 500 grams of was clearly erroneous and procedurally unreasonable. Otuel was sentenced for conspiracy to distribute methamphetamine and possession with intent to distribute methamphetamine. (JA769). The Court should analyze separately, for the possession and conspiracy counts, whether the 525 grams were properly attributed to Otuel. It was procedurally unreasonable for three reasons: it was based on clearly erroneous findings of facts, did not adequately explain Otuel's arguments, and did not explain the rationale for the sentence adequately for appellate review. *See id.* Moreover, the

45

government did not present sufficient evidence at sentencing to prove that the 525 grams of methamphetamine were directly attributable to Otuel. *See United States v. Gilliam*, 987 F.2d 1009, 1010 (4th Cir. 1993). The government is required to prove the quantity "attributable *to a particular defendant*" by a preponderance. *United States v. Bell*, 667 F.3d 431, 441 (4th Cir. 2011)(emphasis supplied).

Examining the possession and conspiracy counts separately, which the trial court did not do, there was little to no evidence that Otuel possessed 525 grams with intent to distribute– and not much more to support that weight for his conspiracy count. This Court cannot properly assess the support, or lack thereof, because the sentencing court did not discuss the evidence supporting its conclusion regarding drug weight at all. (JA695-729). Significantly, the court did not even specifically state that it found a weight of 525 grams on the record of the sentencing hearing – the transcript does not mention that weight at any point. (JA695-729). The court never mentioned the PSR's determination that Otuel was responsible for "525.91" grams of methamphetamine for sentencing purposes.

As discussed extensively above, the approximately 525 grams that was used at sentencing was based on the amount of methamphetamine seized at the motel on November 19. (JA766-767). Before, during, and after trial, and at sentencing, Otuel made a number of nonfrivolous arguments that the seized drugs either were not attributable to Otuel or did not weigh as much as 525 grams. These arguments – none of which were discussed by the court at sentencing – included the following: (1) the drug weight tested at the scene included packaging that should not properly count (JA698, 758), Otuel did not possess the drugs because he was not in the motel room and the drugs instead were found beside Boone and others (JA758), the defense never had an opportunity to weigh the alleged drugs or segregate drug weight from packaging weight because the government destroyed the drugs before trial (JA698), and that the jury found only that the weight exceeded 50 grams (not 500)(JA698).

As noted, the court did not address these arguments at all. Instead, it made a statement that clearly misapplied the law. (JA700). It noted that the jury found that the drug weight was 50 grams or more, "[s]o I think that pretty well covers it with regard to the possession count." (JA700). But the court calculated a base offense level of 34 – the offense

level for 500 grams or more – not a 32, the proper level for 50 grams. (JA769, JA786). *Compare* U.S.S.G. §2D1.1(c)(4)(500 grams equates to a base offense level of 42) *with* §2D1.1(c)(5)(50 to 499 grams is 32). If – as it said – the court based its determination of offense level off of the jury's finding of 50 grams or more (JA700), it should have used an offense level 32. Instead, it applied a 34. This statement is the only remark showing the court's rationale for drug weight, and it incorrectly applied the law. Thus, the trial court neither considered Otuel's arguments, nor explained its rationale, nor correctly applied the law.

By erroneously circumventing the required procedures to reach an incorrect offense level, the trial court overlooked the utter lack of evidence presented by the government at the pretrial hearings, trial and sentencing on weight attributable to Otuel. And the court neglected to consider the strong evidence that the weight attributable to Otuel should be far less than 500 grams (and, in fact, less than 50 grams).

The government did not prove weight by a preponderance. At trial,[4] not only did the evidence not connect the drugs seized at the motel to Otuel, it suggested that the drugs were not within his possession and a

---

[4] The government presented no evidence at sentencing. (JA695-729).

quantity over 500 grams (or even over 50 grams) was not reasonably foreseeable to him – defeating both the possession and conspiracy charges. Otuel was not even inside the motel room where the drugs were found. (JA375, JA381, JA399). Law enforcement agents and officers testified that they had never seen Otuel with any drugs – not in person, or in photographs, or in videos, or in any fashion whatsoever. (JA399-400; JA498-499). Nor had they witnessed Otuel set up or make any drug deals. (JA399-400; JA498-499). The drugs were never tested for Otuel's fingerprints and, when originally tested when seized, appear to have been weighed with their packaging. (JA384-386, JA404-405, JA407). Otuel did not have a key to the motel room, and no documents identifying him (like a driver's license) were found in the room. (JA408-411).

Boone, not Otuel, was found sitting next to the drugs. (JA406-407). Boone was proud of his success as a drug dealer, boasting during his testimony about his dealing career. (JA432-439, JA479). Boone claimed that Otuel sold him drugs (although not the drugs that were used to calculate drug weight, which were limited to those seized at the motel). But there were no witness to the two sales Boone claimed to have received

from Otuel, and (even by Boone's account) he barely knew Otuel. (JA441, JA467-471).

Contrary to living like a successful drug dealer, Otuel was undisputedly living in a storage trailer in a parking lot, with a door that would not even close. (JA445, JA464). There was substantial evidence that Otuel was simply a homeless drug addict, and was at the motel because he wanted a shower. (JA465-466, JA543).

There was only one other person who even claimed to have seen Otuel engage in a drug deal, Sigmon. Sigmon, as well, barely knew Otuel. (JA522, JA545). During his initial, lengthy debriefing with authorities, Sigmond did not even mention Otuel. (JA549-550).

In short, there was no evidence supporting a finding that 500 grams or more of methamphetamine should be attributable to Otuel, or were reasonably foreseeable to him. At minimum, the case should be remanded for a properly- conducted sentencing on weight to determine whether the starting point should be an offense level 34 or 32.

## IV.  There was Not Sufficient Evidence to Convict Otuel of Any of the Counts on which the Jury Convicted Him.

### A.    Standard of Review.

On a challenge to sufficiency of the evidence, this Court reviews the evidence in the light "most favorable to the prosecution" and assumes the jury resolved all credibility disputes or judgment calls in the government's favor. *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003). The Court upholds the verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020). *See also United States v. Huskey*, 90 F.4th 651, 662 (4th Cir. 2024).

"We review de novo a district court's denial of a motion, made pursuant to Rule 29 of the Federal Rules of Criminal Procedure, for judgment of acquittal." *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006)(citing *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005)). The Court reviews denial of a motion for a new trial, under Federal Rule of Criminal Procedure 33, for abuse of discretion. *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006). "'A district court abuses its discretion when it acts in an arbitrary manner, when it fails to consider judicially-recognized factors limiting its discretion, or when it

51

relies on erroneous factual or legal premises.'" *Wall v. Rasnick*, 42 F.4th 214, 220 (4th Cir. 2022)(quoting *United States v. Nicholson*, 676 F.3d 376, 383 (4th Cir. 2012) (other citations omitted)).

## B.    Argument.

There was not sufficient evidence to convict Otuel of any of the counts of conviction: Count 1 (conspiracy to distribute methamphetamine, under 21 U.S.C. § 846), Count 2 (possession with intent to distribute methamphetamine, under 21 U.S.C. § 841), and Count 3 (possession of a firearm in furtherance of a drug trafficking crime, under 18 U.S.C. § 924(c)). The government did not put forth sufficient evidence that Otuel was guilty beyond a reasonable doubt of any of the three charges against him. It relied *solely* on the testimony of Boone and Sigmon – two interested and partial witnesses who were not credible and did not prove each essential element of its claims. Other than these two interested witnesses, there were no other witnesses to the purported conspiracy or to any drug dealing on November 19, 2019. No law enforcement officer testified in support of the conspiracy. No law enforcement officer saw any dealing, ever. The government presented no photographs, videos, audio recordings, or any other direct evidence

52

depicting a drug deal. The entire case – as the government conceded during closing – rested entirely on the woefully unreliable Boone and Sigmon.

Under Rule 29, the verdict will be sustained only if, when the evidence is viewed in the light most favorable to the government, there is substantial evidence to support it. *United States v. Smith*, No. 1:09CR100-2, 2011 WL 809766, at *1 (W.D.N.C. Mar. 2, 2011) (citing *United States v. Sullivan*, 455 F.3d 248, 260 (4th Cir. 2006). Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt. *Id.* (citing *United States v. Young*, 609 F.3d 348, 355 (4th Cir.2010)).

Under Federal Rule of Criminal Procedure 33(a) the Court may vacate any judgment and grant a new trial if the interest of justice so requires. Fed. R. Crim. P. 33(a). When the motion attacks the weight of the evidence, the court's authority is much broader than when it is deciding a motion to acquit on the ground of insufficient evidence. *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985). Unlike a Rule 29 motion for judgment of acquittal, a Rule 33 motion does not require

the Court to view the evidence in the light most favorable to the government, and the court "may evaluate the credibility of the witnesses." *See id*. When the evidence weighs so heavily against the verdict that it would be unjust to enter judgment, the Court should grant a new trial. *Id*.

### 1. Count 1 Conspiracy to Distribute and Possess with Intent to distribute methamphetamine – Under Rule 29.

To establish a drug conspiracy under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt that (1) the defendant entered into an agreement with one or more persons to engage in conduct that violated 21 U.S.C. § 841(a)(1); (2) that the defendant had knowledge of that conspiracy; and (3) that the defendant knowingly and voluntarily participated in the conspiracy. *United States v. Howard*, 773 F.3d 519, 525–26 (4th Cir. 2014). "A mere buyer-seller relationship is insufficient to support a conspiracy conviction." *Id*. Evidence of continuing relationships and repeated transactions can support the finding that there was a conspiracy if coupled with substantial quantities of drugs (here, Boone and Sigmon did not connect Otuel to substantial amounts of drugs). *Id*. (citing *United States v. Reid*, 523 F.3d 310, 317 (4th Cir.2008)). The evidence must go beyond the immediate transaction to show that the

buyer and seller "agreed to work together to further the distribution to third parties." *United States v. Leonard*, 777 F. Supp. 2d 1025, 1037 (W.D. Va. 2011) (citing *United States v. Jones*, No. 94–5403, 1996 WL 226616, at *3 (4th Cir. May 6, 1996) (unpublished)). Without evidence of such an agreement, the buyer and seller have not finalized any act essential to a conspiracy conviction. *Id*. A defendant may not be convicted merely on a showing that he associated with individuals participating in a conspiracy, or by evidence that merely places him at the scene of another person's criminal act. *United States v. Robertson*, 100 F.3d 1113, 1119 (5th Cir. 1997).

The government argued that the evidence of conspiracy fell into two categories: (1) the events at the motel on November 19 and (2) the uncorroborated statements of Sigmon and Boone that Otuel sold them, or directed them to sources of, methamphetamine on a few occasions. Neither is supported by evidence.

With respect to the motel, it is *undisputed* that Otuel was *outside of* when officers identified suspected narcotics within reach of Boone. Officers confirmed the close proximity between the methamphetamine and Boone (not Otuel). There is no evidence that Otuel sold Boone the

55

drugs that were found next to Boone at the motel, and nobody witnessed that alleged transaction. Sigmon was not even there. The strongest evidence was that the purpose of meeting at the motel was so that Otuel could take a shower because he was homeless. Thus, the events of November 19 are of no assistance to the government's conspiracy case.

With respect to the uncorroborated statements of Boone and Sigmon that they transacted drugs with Otuel a few times, there is no evidence of any agreement, with Otuel to participate in any conspiracy to distribute methamphetamine. The government presented no witnesses even corroborating Boone and Sigmon's claimed dealing with Otuel (which, without more, would not be enough to establish conspiracy anyway). Boone and Sigmon both testified that there were witnesses to their purported dealings with them, but the government did not produce those witnesses – because there were none, because the deals did not occur. Boone never saw Otuel deal with Sigmon and Sigmon never saw Otuel deal with Boone.

There was no reliable evidence that Otuel sold to Boone or Sigmon, and there was no evidence that Otuel agreed to join a conspiracy to sell drugs to Sigmon and Boone on a regular basis or other purchasers.

Looking at the evidence in the light most favorable to the government, at best, Boone and Sigmon testified that they (separately) purchased drugs from Otuel (or he directed Sigmon to a source of drugs). However, this simple act of purchasing is not in itself sufficient to satisfy the government's burden to prove beyond a reasonable doubt that a conspiracy existed. *Howard*, 773 F.3d at 525–26; *Leonard*, 777 F. Supp. at 1037. The government put forth no evidence supporting that Otuel, even if he sold the methamphetamine to Boone and Sigmon (he did not), knew or should have known that they planned to sell the drugs, rather than consume them. The testimony was that they were all homeless drug users who personally consumed large quantities of drugs.

### 2. *Possession with Intent to Distribute Methamphetamine – under Rule 29.*

To prevail on Count 2, the government had to prove that Otuel 1) possessed methamphetamine, (2) knowingly, and (3) with the intent to distribute. *United States v. Pigrum*, 922 F.2d 249, 255 (5th Cir. 1991). The government did not present sufficient evidence that Otuel actually possessed the methamphetamine as the evidence presented showed that Otuel was outside of the room where the drugs were found, there was no identification found belonging to Otuel in the backpack containing the

drugs, and the only testimony that the drugs belonged to Otuel came from one unreliable witness.

In *Pigrum*, the Fifth Circuit found that there was insufficient evidence to sustain a conviction for possession of cocaine with intent to distribute on much stronger facts than are present here. *Id.* There, the defendant, a woman, was present at the time of the search, women's undergarments were found in the bedroom dresser; drug residue and drug paraphernalia were in plain view on the kitchen table and in other areas of the house, when officers arrived at the residence, the defendant unlocked the door warning co-defendant that the police were there, and a cocaine buy was made at the residence a couple of hours before the officers arrived to execute the search warrant. *Id.* The Fifth Circuit noted that mere presence in a room with a person who possessed illegal drugs and knowledge about a drug sale did not establish constructive possession. *Id.* Further, the Fifth Circuit found that there was no evidence the women's undergarments belonged to the defendant, and there was testimony that the defendant did not reside in the house. *Id.*

Similar to *Pigrum*, there was no evidence that Otuel resided at the motel room or that he was the person who booked the motel room. Rather,

evidence was presented that Otuel was there to take a shower and to use drugs. The government argued that there was a motorcycle helmet near a backpack that contained alleged drugs and that Otuel had a motorcycle. However – just as, in *Pigrum*, there was no evidence that the women's undergarments belonged to the defendant – there was no evidence that Otuel's DNA was on the helmet, that the helmet belonged to Otuel, or that any of the other defendants did not own a motorcycle helmet or motorcycle. Under the *Pigrum* analysis, there was certainly insufficient evidence connecting Otuel to the drugs in the room. *See also United States v. Onick*, 889 F.2d 1425, 1429 (5th Cir. 1989)(Noting that "[a] reasonable jury could not conclude that the evidence establishes an essential element, possession, necessary to convict Onick of possession with the intent to distribute" where there was substantially more evidence of possession that in Otuel's case.).[5]

Otuel further notes that Count 3, for using a firearm in furtherance of a drug crime, depends on a conviction on Count 2 (JA652-653), the

---

[5] *Onick* further noted: "We will not lightly impute dominion or control (and hence constructive possession) to one found in another person's house. 889 F.2d at 1429 (5th Cir. 1989) (citing *United States v. Watkins*, 519 F.2d 294, 296 n. 6 (D.C.Cir.1975)). The room was rented by Gibson, and was not Otuel's in any manner.

charge for possession with intent to distribute. The court instructed the jury that the first element of the 18 U.S.C. § 924(c) charge was a finding that "the defendant committed the drug-trafficking crime charged in Count Two." (JA652-653). Therefore, if the conviction on Count 2 is vacated, Count 3 should be as well.

### 3. The trial court should have dismissed Count 3 – Possession of a Firearm in Furtherance of a Drug Trafficking Crime – under Rule 29.

Otuel discusses the principal basis for dismissing the firearm in furtherance charge *supra*, in Argument Section II. The government did not present sufficient evidence to the jury that Otuel's firearm was used "in furtherance of" the drug trafficking crime alleged in Count 3 of the Indictment. For Otuel to be found guilty beyond a reasonable doubt on Count 3, the government had to prove that Otuel used his gun in furtherance of whatever dealing – if any – happened in connection the allegation in Count 2, which is limited to events that transpired on November 19, 2019. The only deal that allegedly occurred in or around the room was Boone's unwitnessed and unsupported claim that Otuel sold him the 300 grams of methamphetamine that Boone was caught with. There is no evidence that Boone even knew about Otuel having a

gun during that deal, or that Otuel used the gun to further that sale. The gun had a single bullet, which would be insufficient to help Otuel if any purported deal went sour. It was not fully loaded or even mostly loaded. It was not a semi-automatic weapon. Otuel and his gun were not in the room with drugs or money. Notwithstanding that, even if the government had proven that Otuel was in the room, which it did not, the mere presence of a gun where a drug transaction occurred is not, without more, enough to sustain a § 924(c) conviction. *See United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001).

### 4. The district court should have granted Otuel an new trial under Rule 33.

#### a. The government relied entirely on non-credible witnesses.

The entirety of the government's case relied on two non-credible witnesses, Johnny Boone and Chris Sigmon. Both witnesses had a substantial interest in testifying, in that both witnesses have already received and still anticipate a further dramatic sentence decrease as a result of their cooperation. Boone testified that he was a member of the Aryan Nation and bragged about his life-long career of drug dealing. His testimony was self-serving. Sigmon never saw Boone and Otuel deal

drugs with each other; Boone never saw Sigmon and Otuel deal drugs with each other. Sigmon testified that his brain was so addled by drugs, he could not remember what drugs he had taken to get to that point.

Sigmon's credibility is further diminished because Otuel put forth evidence that Sigmon's testimony about Otuel was substantially different when he was first interviewed by authorities, compared with when he was interviewed months before trial.  When first interviewed in 2021, Sigmon made absolutely no mention of Otuel's involvement in any purported drug dealing – he did not mention his name at all. He never mentioned Otuel until December 2022, shortly before Otuel's anticipated trial, when given the opportunity to cooperate against Otuel in the hope of receiving a lower sentence. And a lower sentence he received, when in January 2023 – a month after he first mentioned Otuel to the government – he was offered an accepted a plea deal that called for dismissal of a 924(c) charge carrying a five year mandatory minimum to run consecutively after his drug charge. When asked about his 2022 debriefing, he could not even rule out the possibility that the prosecutors or agents mentioned Otuel's name first.

In *United States v. Debrew*, the district court found that an officer's testimony regarding the defendant's demeanor was not credible when the officer failed to previously mention the defendant's demeanor at a prior suppression hearing. No. CR 09-2054 MCA, 2011 WL 13190112, at *13 (D.N.M. Apr. 26, 2011). The Court found that the jury's consideration of such non-credible opinion testimony seriously and unfairly prejudiced the defendant. *Id*. Likewise, the Court should disregard Sigmon's inconsistent and unreliable testimony. Sigmon either did not know of Otuel or consider him sufficiently material to mention to the authorities until they asked about him shortly before the trial, when Sigmon understood that he stood to benefit from a substantially lower sentence by accusing Otuel of being in a conspiracy with him.

### b. The government destroyed potentially exculpatory evidence.

A central issue during Otuel's trial was the government's wrongful destruction of potentially exculpatory evidence. All the charges brought against Otuel at trial center around alleged methamphetamine that the government destroyed. On August 23, 2023, the lead case agent Ubaldo Rios ordered the alleged drugs to be destroyed. As such, a total of 766.6 grams of purported methamphetamine was destroyed. While 525 grams

63

were tested, 241 grams of evidence was destroyed that was not tested before destruction. The government has argued that this 241 grams of evidence was packaging that the alleged drugs were wrapped in. This destruction prohibited Otuel from re-testing the alleged drugs and also, testing the alleged packaging for fingerprints. These results would have been exculpatory and would have dramatically altered the government's case against Otuel. It is not determinative whether there was bad faith in the order of destruction given that this evidence was critical and determinative to the prosecution's outcome. *Belcher*, 762 F. Supp. at 671-73.

## CONCLUSION

The Court should vacate the judgment.

## REQUEST FOR ORAL ARGUMENT

Otuel requests oral argument because it would aid the decisional process.

/s/ William R. Terpening
William R. Terpening
N.C. Bar 36418
**TERPENING LAW PLLC**
221 W. 11th Street
Charlotte, North Carolina 28202
(980) 265-1700
terpening@terpeninglaw.com

*Counsel for Jonathan Otuel*

# <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    [ X ] this brief contains [*12,696*] words.

    [   ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.  This brief complies with the typeface and type style requirements because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Century Schoolbook*]; *or*

    [   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>April 3, 2025</u>          <u>/s/ William R. Terpening</u>
                                        *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 3rd day of April, 2025, I caused this Brief of Appellant and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Amy E. Ray
OFFICE OF THE U.S. ATTORNEY
100 Otis Street, Room 233
Asheville, North Carolina  28801
(828) 271-4661
usancw.appeals@usdoj.gov

*Counsel for Appellee*

I further certify that on this 3rd day of April, 2025, I caused a copy of the Sealed Volume of the Joint Appendix to be served, via email, upon counsel for the Appellee, at the above address.

/s/ William R. Terpening
*Counsel for Appellant*